Filed 3/17/14  P. v. Martinez CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>PEDRO MARTINEZ,<br><br>    Defendant and Appellant. | 2d Crim. No. B243221<br>(Super. Ct. No. KA091026)<br>(Los Angeles County) |

Pedro Martinez appeals the judgment entered after a jury convicted him on two counts of first degree murder (Pen. Code,[1] §§ 187, subd. (a), 189), and one count of attempted willful, deliberate, and premeditated murder (§§ 187, subd. (a), 664).  The jury also found true allegations that appellant committed multiple murders (§ 190.2, subd. (a)(3)), and that a principal personally used and intentionally discharged a firearm, which proximately caused great bodily injury or death (§ 12022.53, subds. (b) - (e)).  On the murder charges, the trial court sentenced appellant to two consecutive terms of life without the possibility of parole, plus two consecutive terms of 25 years to life for the firearm enhancements pursuant to section 12022.53, subdivision (d).  Appellant was sentenced to a concurrent term of life plus 25 years for the attempted murder and

[1] All further undesignated statutory references are to the Penal Code.

attendant firearm enhancement allegation (§ 12022.53, subd. (d)).  He was also ordered to pay various fines and fees including a $240 parole revocation restitution fine (§ 1202.45), which was stayed, and was awarded 752 days of presentence custody credit.[2]  Appellant raises claims of prosecutorial misconduct and instructional and sentencing error.  He also contends (1) the court erred in imposing a parole revocation restitution fine; and (2) he is entitled to an additional 33 days of presentence custody credit.  The People concede the latter point, and we shall order the judgment modified accordingly.  We also order the parole revocation restitution fine stricken.  Otherwise, we affirm.

STATEMENT OF FACTS

Robert Ollie bought marijuana from appellant several times in March and April of 2010.  Ollie initiated each transaction by calling appellant and telling him how much marijuana he wanted, which was usually $10 to $20 worth.  Ollie then drove to the front of a mobile home park in Pomona, where appellant met him on a bicycle.  After taking Ollie's money, appellant rode his bike into the mobile home park and returned with the marijuana.

At around 10:00 p.m. on April 29, 2010, Ollie called appellant, whom he knew as "P-Dog," and said he wanted to buy $10 worth of marijuana.  After appellant agreed to the purchase, Ollie was picked up by his friend Michael McCall.  Allen Alexander, whom Ollie did not know, was sitting in the front passenger seat.  Ollie got in the back seat and directed McCall to the mobile home park where the transaction was to take place.

Appellant was waiting for them when they arrived.  After Ollie handed appellant a $10 bill, appellant rode away and returned a few minutes later with a bag of marijuana that was much smaller than Ollie's previous purchases.  Appellant told Ollie, "It's 'AZ,'" which is the name of a higher-quality marijuana from Arizona.  Ollie said, "No, this ain't gon' work" and asked appellant to give him $5 back.  Appellant told Ollie to wait and rode back into the mobile home park with the bag of marijuana.

---

[2] Appellant's codefendant Maximillian Hernandez pled guilty during trial and is not a party to this appeal.

After several minutes, Ollie called appellant and asked where he was. Appellant replied, "I'll be out" and hung up. Shortly thereafter, Ollie heard what he initially thought were firecrackers. Ollie got out of McCall's car and saw appellant shooting at him from the front of the car. Ollie was shot in the back and the leg. He ran to the back of the car, where he fell and lost consciousness.

Police arrived at the scene at about 10:40 p.m. in response to calls reporting that shots had been fired. Ollie was lying face down behind McCall's car and was alive but unresponsive. McCall and Alexander were inside the car and were both dead from gunshot wounds to the torso. Two bullet holes were visible in the windshield, and four .30-30 caliber shell casings were found lying in the street.

Ollie spent a month in the hospital. As a result of his injuries, he is unable to walk and one of his lungs had to be removed. When he was interviewed on May 11, 2010, he was afraid to tell the detective everything that had happened on the night of the shootings. He reported that he went to the location to buy marijuana from "P-Dog," but claimed he did not know who had shot him. At trial, however, he acknowledged knowing at the time that "P-Dog" was the shooter. Ollie also lied when he said he did not recognize appellant from a six-pack photographic lineup. He did so because he did not want to be a "snitch" and put his family in danger.

A few hours after the shootings, appellant and codefendant Hernandez picked up their friend Jesus Diaz in Los Angeles after his release from jail. When they arrived at the mobile home park where the shootings took place, the street was blocked by the police. Diaz asked if they knew why the street was blocked. Appellant and Hernandez looked at each other and laughed, then told Diaz that three people had been shot. Diaz asked who had done it, and appellant and Hernandez told him it was better if he did not know.

After appellant and Hernandez were arrested, they were placed together in a cell that was wired to record their conversations. Hernandez told appellant that he was terminally ill and that doctors said he would die within a year. At one point, appellant and Hernandez agreed that they would tell the police everything in exchange for a 20-

3

year prison sentence. Appellant later told Hernandez that since Hernandez only had a year to live, appellant was going to tell the police that Hernandez shot the victims and that appellant was just in the car and did not know what was happening. Hernandez agreed that he would also tell this to the police.

Appellant offered a different account when he testified at trial in his own defense. He admitted firing the shots that killed Alexander and McCall and wounded Ollie. At the time of the shootings, he had been up for three to four days under the influence of methamphetamine. Prior to the shootings, he had sold Ollie "cools" (cigarettes dipped in PCP) on 10 to 20 different occasions. He denied ever selling marijuana to Ollie, even though he had previously admitted doing so.

On the night of the shootings, Ollie called appellant and arranged to purchase a "cool" from him. From their prior dealings, Ollie knew that one cool cost $10. Appellant got one foil-wrapped cool and rode his bicycle to a car that was parked at the front of the mobile home park where he lived. Ollie was sitting in the back seat. When appellant started to hand Ollie the cool, Ollie gave him a one-dollar bill. Appellant did not hand Ollie the cool, and the car drove away.

Appellant went into a neighbor's trailer and began smoking methamphetamine. Ollie called appellant several times and said he wanted his dollar back. During one of the calls, appellant heard voices in the background saying, "fuck that fool." Appellant agreed to return the dollar. He got his .30-30 Winchester rifle because Ollie had never tried to short-change him before and appellant did not know the two men who were with Ollie.

Hernandez drove appellant to the front of the trailer park, and appellant hid the rifle by his side. He got out and walked toward Ollie, who was standing outside of McCall's car looking around. Ollie turned, and appellant saw something shiny in Ollie's hand and thought it was a gun. Appellant fired the rifle at Ollie, then saw McCall and Alexander moving around inside the car. Appellant thought they had guns too, so he shot at them. Appellant returned to Hernandez's car and said, "Let's go pick up Jesse." Appellant and Hernandez then drove to Los Angeles and picked up Diaz.

4

Appellant claimed that what he told Hernandez in the jail cell was not true. He lied because he was scared and wanted to avoid a life sentence.

DISCUSSION

I.

*Prosecutorial Misconduct*

Appellant contends the prosecutor committed misconduct when he told the jury during closing argument that the instruction on voluntary intoxication (CALCRIM No. 625) only applies "where a person is so drunk or so high that that person . . . doesn't know what he's doing." Although we agree the prosecutor misstated the law, we conclude the error was harmless.

"'The applicable federal and state standards regarding prosecutorial misconduct are well established. "'A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct so "egregious that it infects the trial with such unfairness as to make the conviction a denial of due process."'" [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves "'"the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury."'" [Citation.]" (*People v. Navarette* (2003) 30 Cal.4th 458, 506.)

When a claim of prosecutorial misconduct focuses on the prosecutor's questions or comments before the jury, "'. . . the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.'" (*People v. Cole* (2004) 33 Cal.4th 1158, 1202–1203.) A prosecutor commits misconduct by misstating the law during closing argument. (*People v. Huggins* (2006) 38 Cal.4th 175, 253, fn. 21.)

During closing argument, the prosecutor stated: "Voluntary intoxication is in instruction 625, and it says . . . you may consider, if any, of the defendant's voluntary intoxication only in a limited way. You may . . . consider that evidence only in deciding whether the defendant acted with an intent to kill or the defendant acted with deliberation and premeditation or the defendant was unconscious when he acted. . . . [¶] Let's talk

about that instruction and whether it applies to this case at all. That instruction is reserved for situations where a person is so drunk or so high that that person has no clue what that person is doing, and that person shoots and kills. The law says in that situation that person . . . doesn't know what he's doing, and therefore, he doesn't have the intent to kill . . . . He doesn't have the wherewithal to premeditate and deliberate about the crime." At that point, defense counsel stated, "Objection. Misstates the law." The court then told the jury: "I've provided the law, the jury will read the law, and the jury will follow the law."

We agree with appellant that the prosecutor misstated the law to the extent he asserted that voluntary intoxication only applies when the defendant is so intoxicated that he "doesn't know what he's doing." Such a level of intoxication amounts to unconsciousness, a separate defense that was not at issue in this case. (*People v. Ochoa* (1998) 19 Cal.4th 353, 423–424; CALCRIM No. 626.) The jury's consideration of evidence of appellant's voluntary intoxication was not so limited. As the jury was instructed, evidence of appellant's voluntary intoxication could be considered "in deciding whether the defendant acted with an intent to kill, or the defendant acted with deliberation and premeditation, or the defendant acted in imperfect self defense or complete self defense." (CALCRIM No. 625.)

Although the prosecutor misstated the law on voluntary intoxication, reversal is not required because appellant fails to demonstrate "'. . . a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.'" (*People v. Cole, supra*, 33 Cal.4th at pp. 1202–1203.) Appellant concedes that CALCRIM No. 625, which was given here, properly states the law on voluntary intoxication. When appellant objected to the prosecutor's misstatement, the court admonished the jury to follow the law as set forth in the instructions. The jury was also given CALCRIM No. 200, which informed the jury that it was to follow the instructions and disregard any comments by counsel that conflicted with those instructions. We presume the jurors understood and followed these instructions, which

6

were also highlighted by the prosecutor during his closing argument. (*People v. Hinton* (2006) 37 Cal.4th 839, 871.)

Moreover, the written instructions directly contradicted the prosecutor's assertion that appellant's voluntary intoxication was only relevant if it rendered him unaware of what he was doing. As particularly relevant here, the instructions provided that the evidence could be considered in determining whether appellant acted in imperfect self-defense. A person who purports to act in self-defense, be it imperfect or complete, obviously and logically purports to act with knowledge of what he is doing. Defense counsel also emphasized the evidence of appellant's intoxication during closing argument and correctly stated that the evidence was relevant to appellant's claim of imperfect self-defense even if his intoxication did not render him unconscious. Accordingly, it is not reasonably likely the jury construed the prosecutor's remarks as consistent with the instructions. (*People v. Cole, supra*, 33 Cal.4th at pp. 1202–1203.)

The lack of prejudice is further demonstrated by the relative dearth of evidence supporting appellant's claims of voluntary intoxication and imperfect self-defense. The facts and circumstances surrounding the shootings strongly support an inference that appellant intentionally acted with premeditation and deliberation, rather than in response to a perceived threat to his safety. Although he claimed to have believed that his victims were armed, no evidence to that effect was found at the scene. Moreover, appellant concealed his rifle as he approached the victims and initiated the deadly confrontation that ensued. Only a few hours after killing two people and seriously wounding another, he laughed about it. When he was later arrested and placed in a cell with Hernandez, he spoke about the crimes yet said nothing of the perceived need to defend himself. In light of this evidence, it is not reasonably probable that the prosecutor's misstatements affected the verdict and the error was thus harmless. (*People v. Watson* (1956) 46 Cal.2d 818, 836; *People v. Bordelon* (2008) 162 Cal.App.4th 1311, 1323-1324 [prosecutorial misconduct during closing argument is subject to *Watson* harmless error standard of review].)

7

## II.

### *Refusal to Modify CALCRIM No. 520*

The court instructed the jury on the elements of murder in accordance with CALCRIM No. 520. The jury was also instructed pursuant to CALCRIM No. 571 that appellant was guilty of voluntary manslaughter and not murder unless the prosecution proved he did not act in imperfect self-defense. The instruction went on to provide that appellant acted in imperfect self-defense if (1) he "actually believed that he was in imminent danger of being killed or suffering great bodily injury;" (2) he "actually believed that the immediate use of deadly force was necessary to defend against the danger;" and (3) "[a]t least one of those beliefs was unreasonable."

Appellant claims the court erred in denying his request to modify CALCRIM No. 520 to include the concept of imperfect self-defense. He asserts that the court should have modified the instruction pursuant to the rule that criminal defendants are entitled to requested instructions that pinpoint the defense's theory of the case. (See *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1142.) We are not persuaded.

It is well settled that the trial court need not give pinpoint instructions containing points that are adequately covered in other instructions. (*People v. Gutierrez, supra,* 28 Cal.4th at p. 1144.) Appellant offers nothing of substance that would warrant our rejection of this established rule. His claim that the jury may have been confused as a result of the prosecutor's arguments relating to appellant's claim of imperfect self-defense is also unavailing. The prosecutor made clear that the jury's primary task was to determine whether appellant had acted in imperfect self-defense, and that the prosecution bore the burden of proving beyond a reasonable doubt that he did not so act. Appellant does not dispute that the instructions accurately stated the law. As we previously noted, we presume the jury followed the instructions and heeded the admonition to disregard any arguments that were contrary to those instructions. (*People v. Hinton, supra*, 37 Cal.4th at p. 871.)

In his reply brief, appellant cites *People v. Thomas* (2013) 218 Cal.App.4th 630, for the self-styled proposition that the trial court was required to "elevate the

8

absence of imperfect self-defense to its constitutionally required status as a listed component of a murder conviction." The case does not support such a proposition. In *Thomas*, the Court of Appeal held that the trial court had prejudicially erred in failing to instruct the jury on provocation/heat of passion voluntary manslaughter (CALCRIM No. 570) as a lesser included offense of murder. In reaching that conclusion, the court reasoned that the error was of federal constitutional magnitude because the court had effectively failed "to adequately instruct the jury on the element of malice." (*Id.* at p. 643.) The court did not, however, conclude that the trial court was required to include the elements of CALCRIM No. 570 within the instructions on murder, as set forth in CALCRIM No. 520. Rather, the court merely held that the latter instructions should have been given.

Here, the jury was fully and accurately instructed on the elements of imperfect self-defense as set forth in CALCRIM No. 571. Those instructions made clear that appellant could not be found guilty of murder unless the prosecution bore its burden of proving beyond a reasonable doubt that appellant did not shoot the victims in imperfect self-defense. Contrary to appellant's assertion, the court was not required to give the same instructions when instructing the jury on the elements of murder pursuant to CALCRIM No. 520. The jury was instructed to consider the instructions as a whole, and we do the same in determining their correctness. (*People v. Moore* (2011) 51 Cal.4th 1104, 1140.)

III.

*Firearm Enhancements (§ 12022.53, subd. (d))*

The information against appellant and codefendant Hernandez alleged as to all counts that (1) a principal personally and intentionally discharged a firearm and caused great bodily injury or death to the victims (§ 12022.53, subds. (d) & (e)(1)); (2) a principal personally used a firearm (§ 12022.53, subds. (b) & (e)); and (3) a principal personally and intentionally discharged a firearm (§ 12022.53, subds. (c) & (e)(1)). It was also alleged that the crimes were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(4)). The jury found all of the firearm allegations to be true, yet

9

reached a contrary finding on the gang enhancement allegation. In accordance with the former findings, the court imposed enhancements of 25 years to life on all three counts pursuant to subdivision (d) of section 12022.53.[3]

Appellant claims that the firearm enhancements were imposed in violation of his due process rights. He reasons that the jury's not true finding on the section 186.22, subdivision (b) allegation is fatally inconsistent with its true finding on the section 12022.53, subdivision (e)(1) allegation, which only applies when "[t]he person violated subdivision (b) of Section 186.22."[4]

The court, however, did not impose the firearm enhancements pursuant to subdivision (e)(1) of section 12022.53, and the jury made no findings under that subdivision of the statute. Although the verdict form reflects a finding that "PEDRO MARTINEZ, a principal, personally and intentionally discharged a firearm, to wit, a rifle, within the meaning of Penal Code Sections 12022.53(c) and 12022.53(e)(1)," the instructions made no reference to subdivision (e)(1) or the substance thereof.[5] As appellant acknowledges, the statute's inclusion on the verdict form is "just boilerplate[.]"

---

[3] The sentences on the enhancement allegations found true under subdivisions (b) and (c) of section 12022.53 were stayed pursuant to section 654.

[4] Subdivision (d) of section 12022.53 states in pertinent part: "Notwithstanding any other provision of law, any person who, in the commission of a felony . . . personally and intentionally discharges a firearm and proximately causes great bodily injury . . . or death, to any person other than an accomplice, shall be punished by an additional and consecutive term of imprisonment in the state prison for 25 years to life." Subdivision (e)(1) states: "The enhancements provided in this section shall apply to any person who is a principal in the commission of an offense if both of the following are pled and proved: [¶] (A) The person violated subdivision (b) of Section 186.22. [¶] (B) Any principal in the offense committed any act specified in subdivision (b), (c), or (d)."

[5] Appellant admitted he was the shooter and it was never alleged otherwise. It is apparent that the allegations he acted as a "principal" were only relevant to the charges against his codefendant Hernandez, who "pled out" of the case after instructions were read to the jury.

10

The jury *was*, however, instructed on the elements of subdivisions (b), (c), and (d) of section 12022.53. Pursuant to those instructions, the jury was required to determine, as provided in subdivision (d), whether appellant personally and intentionally discharged a firearm, thereby causing great bodily injury or death to the victims. The verdict form unequivocally reflects that the jury answered this question in the affirmative. Accordingly, the court was required to impose enhancements of 25 years to life as to each count, notwithstanding the jury's rejection of the gang allegation. (§ 12022.53, subd. (d).)

IV.

*Presentence Custody Credits*

Appellant claims he is entitled to an additional 33 days of presentence custody credit. The People correctly concede the point. Appellant was in custody from the date of his arrest on June 18, 2010, and his sentencing on August 8, 2012. He was thus entitled to 783 days presentence custody credit. (§ 2900.5, subd. (a).) The court, however, only awarded 750 days of credit. We shall accordingly order that the judgment be modified to correct this error.

V.

*Parole Revocation Restitution Fine (§ 1202.45)*

Appellant contends the court erroneously imposed and stayed a $240 parole revocation restitution fine under section 1202.45 because his sentence does not include a period of parole. The People acknowledge that appellant's position finds support in *People v. Oganesyan* (1999) 70 Cal.App.4th 1178 (*Oganesyan*). They claim, however, that *Oganesyan* was effectively overruled by *People v. Brasure* (2008) 42 Cal.4th 1037 (*Brasure*).

We conclude that *Oganesyan* is still good law and find its reasoning persuasive. The defendant in that case received two indeterminate sentences, one of which was life without the possibility of parole. The Court of Appeal struck the parole revocation restitution fine imposed by the trial court under section 1202.45, reasoning that such a fine is proper only when the defendant's sentence includes a possibility of

11

parole.  (*Oganesyan, supra*, 70 Cal.App.4th at p. 1183.)  In *Brasure*, our Supreme Court held that a parole revocation restitution fine was properly imposed notwithstanding the defendant's death sentence because he also received determinate sentences on related counts for which a period of parole was applicable.  The court distinguished *Oganesyan* on the ground that the sentence imposed in that case did not include any determinate terms for which a period of parole applied.  (*Brasure, supra*, 42 Cal.4th at p. 1075.)  The court explained:  "As in *Oganesyan*, to be sure, defendant here is unlikely ever to serve any part of the parole period on his determinate sentence.  Nonetheless, such a period was included in his determinate sentence by law and carried with it, also by law, a suspended parole revocation restitution fine.  Defendant is in no way prejudiced by assessment of the fine, which will become payable only if he actually does begin serving a period of parole and his parole is revoked."  (*Ibid.*)

Appellant, like the defendant in *Oganesyan*, received a sentence that does not include a determinate term with a period of parole under section 1170.  "Because [appellant's] sentence included no period of parole and he was sentenced to no determinate term, it was improper to impose the parole revocation fine."  (*People v. Battle* (2011) 198 Cal.App.4th 50, 63, citing *Brasure, supra*, 42 Cal.4th at p. 1075, and *Oganesyan, supra*, 70 Cal.App.4th at p. 1183; see also *People v. DeFrance* (2008) 167 Cal.App.4th 486, 505 [same], and *People v. Jenkins* (2006) 140 Cal.App.4th 805, 819 [same].)  We shall accordingly order the fine stricken.

DISPOSITION

The judgment is modified to reflect that appellant is entitled to 783 days of presentence custody credit.  The parole revocation restitution fine imposed under section 1202.45 is stricken.  The clerk of the superior court is directed to prepare an amended

12

abstract of judgment and forward a copy to the Department of Corrections and Rehabilitation. As so modified, the judgment is affirmed.

NOT TO BE PUBLISHED.


PERREN, J.


We concur:


GILBERT, P. J.


YEGAN, J.

Tia Fisher, Judge

Superior Court County of Los Angeles
_____

Brett Harding Duxbury, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Yun K. Lee, Eric E. Reynolds, Deputy Attorneys General, for Plaintiff and Respondent.